551 P.2d 1360

**EL DORADO AT SANTA FE, INC., a New Mexico Corporation, Plaintiff-Appellant,**

**v.**

**BOARD OF COUNTY COMMISSIONERS OF SANTA FE COUNTY, New Mexico, et al., Defendants-Appellees,**

**v.**

**CENTRAL CLEARING HOUSE, INC., et al., Intervenors-Appellees.**

**No. 10658.**

Supreme Court of New Mexico.

June 23, 1976.

Rehearing Denied July 19, 1976.

314

Olmsted & Cohen, Charles D. Olmsted, Santa Fe, for plaintiff-appellant.

Bachicha & Casey, Pat Casey, Santa Fe, for defendants-appellees.

White, Koch, Kelly & McCarthy, Santa Fe, for intervenors-appellees.

OPINION

STEPHENSON, Justice.

Plaintiff-appellant (El Dorado) appeals from an order quashing an alternative writ of mandamus. El Dorado is the owner, developer and subdivider of a tract of land in Santa Fe County situated more than five miles from the boundary of any municipality. The alternative writ states in pertinent part:

4. Commencing in 1970, Plaintiff caused a portion of the Lands, consisting of approximately 6,000 acres, to be surveyed, planned, platted and subdivided by a duly licensed New Mexico surveyor as a residential subdivision known as "El Dorado at Santa Fe" (the Subdivision). The Subdivision was so surveyed, planned, platted and subdivided by said surveyor as to contain and provide, and the plats thereof were so prepared by said surveyor as to depict and describe, approximately 2,810 lots, necessary streets and roads defined by permanent monuments conforming with existing roads adjoining the Subdivision, permanent monuments defining the boundaries of the Subdivision, dedicated legal access from an existing public way to each lot of the Subdivision, and all necessary utility and other public easements. Further, the Subdivision, and all plats thereof, complied and conformed with the provisions and requirements of all applicable New Mexico statutes and with the "Santa Fe County, New Mexico, Land Subdivision Regulations" (the Land Subdivision Regulations) passed, approved and adopted by the Board pursuant to its Resolution No. 1971–20, on June 7, 1971.

5. On or about April 10, 1972, Plaintiff submitted the plats described in Paragraph 4 above to the Board for its approval, and, on said date, the Board reviewed and determined that said plats complied and conformed with all applicable statutory provisions and requirements, as well as with the provisions and requirements of the Land Subdivision Regulations; however, presumably relying upon the provisions of Art. VI, § 3, Paragraph A of the Land Subdivision Regulations, the Board declined and refused to approve the plats of the entire Subdivision; rather, by motion duly made and carried on April 10, 1972, the Board approved the plats described in Paragraph 6 below covering approximately one-third (⅓) of the Subdivision, and declared that it would grant final plat approval as to the rest of the Subdivision when Plaintiff had sold at least one-half (½) of the lots situate in the part of the Subdivision then approved.

6. While it duly registered its objections to the actions of the Board described in Paragraph 5 above, Plaintiff did not seek a writ of mandamus or other judicial relief requiring the Board to approve the entire Subdivision and to endorse said approval of all plats thereof; rather, Plaintiff accepted and relied upon the Board's statement that final approval of the remainder of the Subdivision would be granted by it after Plaintiff had sold one-half (½) of the lots in the part of the Subdivision approved on April 10, 1972, and, on July 10, 1972, Plaintiff filed the following plats and sheets thereof with the Santa Fe County Clerk, upon which the approvals of the Board and its then members were duly endorsed:

[Here followed a tabulation of the 939 lots so approved.]

7. Between July 10, 1972 and July 8, 1974, Plaintiff sold more than one-half (½) of the lots depicted and described by the plats described in Paragraph 6 above.

8. On or about July 8, 1974, Plaintiff resubmitted to the Board the plats described in Paragraph 4 above covering all portions of the Subdivision not approved by the Board on April 10, 1972, and informed the Board that Plaintiff had sold more than one-half (½) of the lots contained in the parts of the Subdivision approved by the Board on said

latter date; however, presumably still relying upon the provisions of Art. VI, § 3, Paragraph A of the Land Subdivision Regulations, the Board declined and refused to approve all resubmitted plats of the Subdivision; rather, by motion duly made and carried on July 8, 1974, the Board approved only a portion of the Subdivision containing 500 lots and declared that it would not grant final approval of the remainder of the Subdivision (i. e., 1,371 lots; 2,810 lots minus 939 lots and 500 lots) until after one-third (1/3) of all Subdivision lots theretofore approved by it had been "developed" (i. e., "developed" by construction of permanent improvements on said lots).

9. When submitted to the Board by Plaintiff on or about April 10, 1972, the entire Subdivision and all plats thereof complied and conformed with all valid requirements for Board approval imposed by New Mexico law; accordingly, the Board should be directed and ordered to approve the same and to endorse its approval thereon. Alternatively, Plaintiff relied upon and complied with the condition precedent to final plat approval of all Subdivision plats required by the Board on April 10, 1972—namely, sale of at least one-half (1/2) of the Subdivision lots approved by the Board on said date; accordingly, the Board should be directed and ordered to approve the same and to endorse its approval thereon.

El Dorado sought an order requiring the Santa Fe Board of County Commissioners (Board) to approve all plats of the subdivision not theretofore approved which were submitted on April 10, 1972, and to require the members to endorse their approval. Various corporations, associations and individuals intervened as defendants [1] and are aligned with the Defendants-appellees (Board).

The Board's answer asserted, inter alia, that mandamus would not lie because the Board was under no clear legal duty to do the acts sought to be commanded and such acts were discretionary or "semi-judicial." The latter contention was expanded in a subsequent affirmative defense asserting that the Board had:

. . . the power and authority to regulate the orderly development of any subdivision within the boundaries of the County of Santa Fe in a manner which will promote the best interests and for the general benefit and welfare of all residents of Santa Fe County.

What happened next is not as clear as it might be. El Dorado says that the trial court treated the assertions in the answer concerning mandamus as a motion to dismiss. The Board claims that the court merely requested briefs on that issue. It does not make very much difference, because it is clear that the court quashed the alternative writ as having been improvidently issued without a hearing on the merits or the introduction of any evidence. Therefore, we are only concerned with the sufficiency of the contents of the alternative writ which at the trial court level were tested and found wanting.

■ We have nothing to add to the prerequisites to relief by mandamus against public officers and boards which we have stated over the years. So far as here material, disregarding the issues of standing and the adequacy of legal remedies with which we are not concerned, mandamus lies at the request of a person beneficially interested to compel the performance of an affirmative act by another where the duty to perform the act is clearly enjoined by law and where there is no other plain, speedy and adequate remedy in the ordinary course of law. §§ 22–12–4, –5, N.M. S.A.1953. The act to be compelled by mandamus must be ministerial which has been defined as to a public official as "an

---

1. Central Clearing House, Inc., Old Pecos Trail Association, Galisteo Community Corporations, Santa Fe Area Defense Fund, Galisteo Mutual Domestic Water Users Association, Robert and Darlene Rosenwald, Richard and Christina Griscom, Albert and Patricia Niblack, Paul D. Fink and Frank and Mary Anaya.

act or thing which he is required to perform by direction of law upon a given state of facts being shown to exist, regardless of his own opinion as to the propriety or impropriety of doing the act in the particular case." *State v. Walker,* 60 N.M. 459, 463, 292 P.2d 329, 332 (1956). These acts and duties under them are no less ministerial because the public official, upon whom the duty is enjoined, may have to satisfy himself as to the existence of facts necessary to require his action, and where he refuses to act after such a determination is made, mandamus is the proper remedy. *Lorenzino v. James,* 18 N.M. 240, 131 P. 1172 (1913). Where he refuses or delays, mandamus will issue to compel acts committed to his discretion if the law requires him to act one way or another. The writ will not, however, direct the performance of the particular act from among two or more allowed alternatives. See *State ex rel. Castillo Corp. v. New Mexico St. T. Com'n,* 79 N.M. 357, 443 P.2d 850 (1968).[2]

Before examining the powers of the Board, we must first briefly analyze the powers of a county government in general. A county is but a political subdivision of the State, and it possesses only such powers as are expressly granted to it by the Legislature, together with those necessarily implied to implement those express powers. *Dow v. Irwin,* 21 N.M. 576, 157 P. 490 (1916); cf. *Donalson v. San Miguel County,* 1 N.M. 263 (1859); see also 56 Am.Jur.2d Municipal Corporations §§ 17–18 (1971). When the Legislature confers an express power or imposes a duty upon a county and prescribes the method for exercising the power or discharging the duty, that method is exclusive. *Fancher et al. v. County Com.,* 28 N.M. 179, 210 P. 237 (1922); cf. *City of Clovis v. Crain,* 68 N.M. 10, 357 P.2d 667 (1960).

We turn now to a definition of the duties and powers of the Board at times material to this litigation. The New Mexico Constitution is silent on the subject of subdivisions and county regulation of them. In addition, in the past the statutes did not specify the details of regulation of ·subdivisions lying outside of five miles from the exterior boundaries of any municipality. What little legislative direction that was provided was contained in parts of the 1965 Municipal Code [3] and in the 1963 Land Subdivision Act.[4] The 1973 New Mexico Subdivision Act,[5] currently in force was not promulgated by the Legislature until after plaintiff submitted the plat of this subdivision for defendant's approval on April 10, 1972.

Section 14–19–5(A) of the 1965 Municipal Code conferred jurisdiction upon the Board to approve subdivisions more than five miles from the boundary of any municipality. Under § 14–19–1 the subdivision with which we are concerned was included within the definitions of "subdivide," "subdivision," and "plat."[6] An acknowledged statement by the owner con-

---

2. See also Dumars and Browde, Mandamus in New Mexico, 4 N.M.L.Rev. 155 (1974).

3. Sections 14–19–1 through –14.1, N.M.S.A. 1953. Some of these sections were amended by ch. 348, §§ 31–36, [1973] N.M.Laws 1583–87. These amendments are not at issue in this case since they occurred after April 10, 1972, the date of filing of the subdivision with the Board.

4. Sections 70–3–1 through –8, N.M.S.A.1953 (Supp.1975).

5. Sections 70–3–9, 70–5–1 through –29, N.M. S.A.1953 (Supp.1975).

6. " 'Subdivide' or 'subdivision' means the division of land into two [2] or more parts by platting or by metes and bounds description into tracts of less than five [5] acres in any one [1] calendar year for the purpose of:
   A. Sale for building purposes;
   B. Laying out a municipality or any part thereof;
   C. Adding to a municipality;
   D. Laying out suburban lots; or
   E. Resubdivision.
'Plat' means map, chart, survey, plan or replat certified by a license or registered surveyor which contains a description of the subdivided land with ties to permanent monuments."

senting to the subdivision was required by § 14–19–3. Section 14–19–2 provided that every subdivider must furnish a plat of the proposed subdivision prepared by a licensed surveyor and accurately describing each lot. Finally, and most importantly, § 14–19–6 stated:

> Before a plat of any subdivision within the jurisdiction of a county is filed in the office of the county clerk, the plat shall be approved by the board of county commissioners of the county wherein the proposed subdivision lies. The board of county commissioners shall not approve and sign a plat unless the:
>
> A. Proposed streets conform to adjoining streets;
>
> B. Streets are defined by permanent monuments to the satisfaction of the board of county commissioners; and
>
> C. Boundary of the subdivision is defined by permanent monuments.

Two sections of the 1963 Subdivision Act are also applicable. Section 70–3–2 defined the terms "subdivided land" and "subdivision." [7] Moreover, § 70–3–3 specifies in part:

> It shall be unlawful to sell, offer to sell, lease or offer to lease to the public subdivided land as defined hereinabove until a plat of such subdivided land being sold has been approved by the county commission wherein such land is situate;
>
> . . . .

Therefore, in 1972 at the time of the filing the above statutes were all that were applicable to rural subdivisions. We conclude that under these statutes nothing remained for the Board to do but the ministerial act of endorsing their approval on the plats which had complied with all stat-

utory requirements. Clearly mandamus was a proper remedy when it refused to do so.

We are impressed with the reasoning in *County of Maricopa v. Anzwool, Inc.,* 19 Ariz.App. 242, 506 P.2d 282 (1973). In that case mandamus was issued by the trial court directing the county board of supervisors to approve a subdivision plat. Although the plat had conformed with all legal requirements for approval, the board had delayed action until it rezoned the land and then denied approval on the ground that the subdivision did not conform with the new zoning law. Mandamus was affirmed by the Arizona Court of Appeals. Quoting from an earlier decision in *Robinson v. Lintz,* 101 Ariz. 448, 420 P.2d 923 (1966), the court discussed the reasoning:

> "The shocking consequences of a finding that the Board possessed such unshackled authority is well illustrated by the facts of the present case. Here the Board held action on the plaintiff's submitted subdivision plan in abeyance pending future consideration of a proposed zoning change despite the fact that the plan complied completely with the zoning ordinance then in existence. Nearly four months passed between the time that the subdivision plan was presented to the Board and the time that the Board finally made a decision on the proposed zoning change. If the Board is deemed to have authority to detain development of one's land for this length of time what is to prevent it from holding a landowner in absolute limbo for a year or two while landowner pays taxes, pays interest on normally large loans for proposed developments, and watches contemplated benefit from his original investment and subdivision program dis-

7. " 'Subdivided land' and 'subdivision' means improved or unimproved land divided, or proposed to be divided, into twenty-five [25] or more lots or parcels for the purpose of sale or lease, but does not include the leasing of apartments, offices, stores or similar space within a building unless an undivided interest in the land is granted as a condition pre-

cedent to occupying space within the building and does not include subdivisions approved by an agency of the United States or by a municipality, and does not include any subdivision where the primary business of the developer is the construction of home improvements;"

solve into nothingness." 101 Ariz. at 451, 420 P.2d at 926.

Apropos to having the Board act on the zoning as it existed when the appellee prepared and presented for approval its plat to the Board is the following from the *Robinson* case:

"A basic sense of justice and a security of one's rights in property require that at some definite point in time a property owner should know how he may subdivide his property. An acknowledgement of recording as establishing a right to act upon subdivision plans complying with zoning regulations then in existence provides this invaluable certainty. It also takes into account principles of equity, as it is at the point of recording that the subdivider has necessarily incurred the expense of numerous surveying and legal fees in reliance on the ordinance then in effect. Under the circumstances, we believe that any other standard for determining a lot to be 'legally established' would be impractical and arbitrary." 101 Ariz. at 452, 420 P. 2d at 927.

19 Ariz.App. at 244–45, 506 P.2d at 284–85.

See also *Knutson v. State,* 239 Ind. 656, 157 N.E.2d 469, reh. denied, 239 Ind. 656, 160 N.E.2d 200 (1959).

■ Where then is the discretion asserted by the Board? While the statutes quoted did not expressly impose a duty to approve the plat when the requirements of § 14–19–6 were met, the duty existed by necessary implication. No other requirements were laid down as a prerequisite for approval, and recording and sale were prohibited absent such approval. §§ 14–19–6, 70–3–3. The Board was charged with the duty to consider whether the requirements of § 14–19–6 had been met. The writ

states not only that those requirements were met, but also that the Board had determined that such was the case.

Upon compliance with § 14–19–6 by El Dorado, it had a right to have the Board determine that such was the case; upon the Board so determining, it had a right to have the members of the Board so signify by performing the ministerial act of signing their names on the plats.

Under present internal practices and criteria, a case of this simplicity would normally be reversed without opinion. However, we are concerned about certain language used by us in our opinion in *Mobile America, Inc. v. Sandoval County Commission,* 85 N.M. 794, 518 P.2d 774 (1974), the case upon which the Board rests its contention that it had some large amorphous discretion.

■ *Mobile America* is readily distinguishable from this case for a number of reasons, some apparent from the opinion and others which are not. It reached a correct result. Inasmuch as the statute considered there and here has been amended,[8] we see no need to discuss the case further. Upon reflection, we regard what was said in *Mobile America* on the subject of discretion reposed in boards of county commissioners in relation to § 14–19–6, and their duties thereunder being other than ministerial,[9] was erroneous. Therefore, lest *Mobile America* be applied as precedent in analagous cases, it is overruled.

Upon compliance with the statutory prerequisites to subdivision and sale by a subdivider, followed by a determination of the board of county commissioners that such compliance had in fact occurred, rights vest in the subdivider which cannot thereafter be withheld, extinguished or modified except upon due process of law. This

---

8. See note 3 supra and accompanying text.

9. "We are unable to discover any legislative intent which requires the appellee [county commission] to approve any subdivision plat

which merely fulfills the aforementioned three requirements [of § 14–19–6]. These are minimum requirements and leave some discretion and judgment with the county commission." 85 N.M. at 795, 518 P.2d at 775.

leaves little for us to consider other than the Board's 1971 Land Subdivision Regulations and the legal consequences said by the Board to flow from them. The Board at the material times relied upon Article VI, § 3, ¶ A of these regulations as empowering it to order a "phased *development*."[10] Obviously the regulations were utterly void. Prior to enactment of the 1973 New Mexico Subdivision Act, the power to adopt, promulgate and enforce subdivision regulations had not been delegated to the Board.[11]

The Board does not now assert that the regulations were valid, but attributes significance to them in respect to waiver, estoppel and laches. The Board's answer asserted among various affirmative defenses that "the plaintiff is estopped" without stating any facts in support thereof; that the plaintiff "waived" its right to contest the Board's actions of April 10, 1972 or July 8, 1974 by failure to appeal; and that the plaintiff "elected" to comply with the Land Subdivision Regulation of June 7, 1971 without stating any legal theory which would yield significance to the allegation. This last contention is not argued here, and laches was not pled. However, the letter by which the trial court announced its decision stated in part:

> The acceptance of the limited approval and inaction to test the validity of the Commission's order waives, if not by estoppel, at least by laches any right to now seek mandamus.

This statement presumably gives rise to the argument here on these defenses.

We have stated the elements of laches,[12] estoppel[13] and waiver.[14] There are no facts to support any of these defenses. The Board asserts they are all present as a matter of law. We search the alternative writ and find no element of any of the defenses established as a matter of law. An examination of the answer also adds nothing in this behalf.

Mere delay by El Dorado in asserting its rights is not sufficient to establish any of these defenses against it, particularly since the delay might be explained. Nothing before us indicates El Dorado was aware the Board was going to change the ground rules from "sale" to "development" in mid-game. We know of no rule of law which requires an entrepreneur in a regulated business to either commence operations by suing the regulatory authority or give up his rights. A prudent man might well seek an accommodation. There is little about the Board's position in this case which excites our sympathy. It adopted and sought to enforce void regulations which gave rise to the problem. We hold that waiver and estoppel as a matter of law were not established. Neither was laches, but it was not an issue in any case.

The order quashing the alternative writ is reversed. The trial court is directed to set the order aside and to proceed in a manner consistent with this opinion.

IT IS SO ORDERED.

OMAN, C. J., and McMANUS, J., concur.

10. "The Final Plat shall conform substantially to the Preliminary Plat as approved, and if desired by the Subdivider, it may constitute only that part of the approved or conditionally approved Preliminary Plat which he proposes to record and develop at the time, . . . and, provided further that the Planning Commission may regulate the Subdivider to include or exclude whatever part of the Preliminary Plat the final plat-

ting of which at the time it deems necessary for orderly development."

11. See § 70-5-9, N.M.S.A.1953 (Supp.1975).

12. *Cave v. Cave*, 81 N.M. 797, 802, 474 P.2d 480, 485 (1970).

13. *Westerman v. City of Carlsbad*, 55 N.M. 550, 555–56, 237 P.2d 356, 359 (1951).

14. *Ed Black's Chevrolet Center, Inc. v. Melichar*, 81 N.M. 602, 471 P.2d 172 (1970).